**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **P&F LUMBER COMPANY (2000), L.L.C.,** | * | |
| **ST. TAMMANY LAND CO, L.L.C. AND PF** | * | |
| **MONROE PROPERTIES, L.L.C.** | * | |
| **PLAINTIFFS,** | * | **CASE NO.** |
| | * | |
| **V.** | * | |
| | * | |
| **UNITED STATES FISH AND WILDLIFE** | * | **JUDGE** |
| **SERVICE, DAN ASHE, DIRECTOR OF** | * | |
| **UNITED STATES FISH AND WILDLIFE** | * | |
| **SERVICE, IN HIS OFFICIAL CAPACITY;** | * | |
| **UNITED STATES DEPARTMENT OF** | * | **MAGISTRATE JUDGE** |
| **INTERIOR; AND, KENNETH SALAZAR,** | * | |
| **SECRETARY OF THE DEPARTMENT OF** | * | |
| **INTERIOR, IN HIS OFFICIAL CAPACITY** | * | |
| **DEFENDANTS** | * | |
| | * | |

**COMPLAINT FOR DECLARATORY**
**AND INJUNCTIVE RELIEF**

NOW INTO COURT, through undersigned counsel come plaintiffs, P&F Lumber Company (2000), L.L.C., St. Tammany Land Co., L.L.C. and PF Monroe Properties, L.L.C. (collectively the "Poitevent Landowners") who respectfully aver:

**INTRODUCTION**

1.

This is an action for declaratory judgment and injunctive relief against Defendants for violating federal statutes and the U.S. Constitution. By final rule, dated June 12, 2012, 77 Fed. Reg. 35118, et seq. (the "Rule"), Defendants, through the U.S. Fish and Wildlife Service, designated critical habitat for the Dusky Gopher Frog (previously Mississippi Gopher Frog) that encompasses the Poitevent Landowners' property in St. Tammany Parish, Louisiana, in violation of the Endangered Species Act (ESA), 16 U.S.C. § 1531, et seq., and the Administrative

1

Procedure Act (APA), 5 U.S.C. § 551, et seq.  The designation of the critical habitat is illegal, improper, and illogical for a myriad of reasons.  According to the government, the land owned by the Poitevent Landowners that is designated as "critical habitat" (Unit 1) has not been occupied by the Dusky Gopher Frog since at least the 1960s.  76 Fed. Reg. 59783.  Moreover, this land does not contain any of the physical or biological features (known as Primary Constituent Elements, or PCEs), that the U.S. Fish and Wildlife Service mandates be found on the land, and which it then mandates as being "essential" to the conservation of the species.

2.

In order for the land (which has operated as a timber farm for more than half a century) to be converted so that it contains those essential features, the Poitevent Landowners (not the government) would have to spend a very large sum of money and effort to create the habitat features on this very large tract of land containing some 1,544 acres.[1]  This would also require that the Poitevent Landowners breach their timber lease with Weyerhaeuser, a lease that has been in effect since the 1950s and does not terminate until July 1, 2043.

3.

Then, in order to maintain the frog's habitat, the Poitevent Landowners would have to burn the property.  In turn, the burning of the land would destroy the value of the 1,544 acres, the Poitevent Landowners' adjacent lands, would also endanger both the residents of Pearl River Louisiana (a few miles to the east of the lands subject to the Rule) and those driving on Louisiana Highway 36, a highway that runs through the land, as the 1,544 acres and the surrounding property also owned by the Poitevent Landowners would be inundated with smoke.

---

[1]  The Poitevent Landowners own approximately 95% of the land affected by the Rule (the "Poitevent Lands"), all of which is leased to Weyerhaeuser Company ("Weyerhaeuser").  Weyerhaeuser owns the remainder of the land subject to the Rule in fee.

2

Thus, burning the 1,544 acres would utterly destroy any potential to either develop or sell the 1,544 acres and the surrounding land.

4.

The government's own economic analysis admits that the negative impact of the designation of just the land owned by the Poitevent Landowners is at least $34 million. Yet, this economic analysis is seriously flawed and artificially low, in that it does not properly consider the additional cumulative effects of the designation, or the effects to lands and land value of the Poitevent Landowners' surrounding property. The Poitevent Landowners have repeatedly told the government that they have no intention of manufacturing (from whole cloth and at their own expense) a viable Dusky Gopher Frog habitat on their property at the complete sacrifice of its value.

5.

Despite the enormous negative impact this designation will have on the Poitevent Landowners, and the fact that the Dusky Gopher Frog is not present on the land and never will be, the government has refused to reconsider the designation or exclude the land owned by the Poitevent Landowners in the vain "hope" that the Poitevent Landowners will voluntarily choose to do what the government will not do and which it knows it cannot force them to do. The Rule therefore not only defies logic and common sense but also federal law and the United States Constitution. As has been said before about a similar situation: "The Service may not statutorily cast a net over tracts of land with the mere hope that they will develop PCEs and be subject to designation." *Cape Hatteras Access Preservation Alliance v. U.S. Dept. of Interior*, 344 F. Supp. 2d 108, 122 (D.C.C. 2004).

3

6.

For all of the reasons set forth in this Complaint for Declaratory Relief and Injunction, the Rule is illegal and must be nullified.

## JURISDICTION AND VENUE

7.

This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 (federal question jurisdiction); 16 U.S.C. § 1540(c) and (g) (actions arising under the citizen suit provision of the Endangered Species Act); and 5 U.S.C. § 702 (providing for judicial review of agency action under the Administrative Procedure Act).

8.

The Poitevent Landowners satisfied the notice requirement of the Endangered Species Act citizen suit provision, 16 U.S.C. § 1540(g)(2).  More than 60 days ago, by letter dated October 18, 2012, the Poitevent Landowners provided Defendants written notice of the violations that are the subject of this complaint in accordance with 16 U.S.C. § 1540(g)(2)(C). The notice is attached as Exhibit 1 and is incorporated herein by reference.  Defendants have not responded to this notice or taken any action to withdraw the final rule at issue here, or to otherwise remedy their violations of law.

9.

An actual, justiciable controversy now exists between the Poitevent Landowners and Defendants. Relief is proper under 28 U.S.C. § 2201 (authorizing declaratory relief) and § 2202 (authorizing injunctive relief).

10.

The federal government has waived sovereign immunity in this action under 16 U.S.C. § 1540(g) and 5 U.S.C. § 702.

4

11.

The Poitevent Landowners have exhausted all administrative remedies.

12.

Venue is proper in this Court under 28 U.S.C. § 1391(e) in that a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated in this judicial district.

## THE PARTIES

### Plaintiffs

13.

P&F Lumber Co. (2000), L.L.C., St. Tammany Land Co., L.L.C. and PF Monroe Properties, L.L.C. are all Louisiana limited liability companies that collectively own approximately 95% of the 1,544 acres of forested property, currently used as a tree farm, identified in the Rule as Unit 1 in St. Tammany Parish, Louisiana, and included as critical habitat for the Dusky Gopher Frog

### Defendants

14.

Defendant United States Department of Interior (Department) is an agency of the United States. Congress has charged the Department with administering the Endangered Species Act for certain species, including the Dusky Gopher Frog.

15.

Defendant Kenneth Salazar is Secretary of the United States Department of Interior (Secretary). He oversees the Department's administration of the Endangered Species Act and is sued in his official capacity.

5

16.

Defendant United States Fish and Wildlife Service (Service) is an agency of the United States Department of Interior.  The Service has been delegated responsibility by the Secretary for day-to-day administration of the Endangered Species Act, including the designation of critical habitat.

17.

Defendant Daniel M. Ashe is Director of the United States Fish and Wildlife Service.  He oversees the Service's administration of the Endangered Species Act and is sued in his official capacity.

18.

All of these Defendants are responsible for the violations alleged in this complaint.

## LEGAL FRAMEWORK

### Listing of Threatened or Endangered Species

19.

Under Section 4 of the Endangered Species Act, Defendants must list a species as "threatened" or "endangered" based on certain factors relating to habitat, overutilization, disease or predation, existing regulatory mechanisms, or other factors. *See* 16 U.S.C. § 1532(20).

20.

An "endangered" species is one "which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A "threatened" species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

21.

Endangered species are specifically protected by Section 9 of the Endangered Species Act, which, among other things, makes it unlawful for any person to "take" such species. *See* 16 U.S.C. § 1538(a)(1)(B). The term "take" means to "harass, harm, hunt, pursue, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct," and may include habitat modification. 16 U.S.C. § 1532(19)

**Critical Habitat Designation**

22.

Under Section 4 of the Endangered Species Act, when a species is listed as threatened or endangered, Defendants must designate critical habitat for that species "to the maximum extent prudent and determinable." 16 U.S.C. § 1533(a)(3)(A).

23.

Critical habitat is defined as:

(i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 4 of this Act [15 USCS § 1533], on which are found those physical or biological features (I) **essential to the conservation of the species** and (II) which may require special management considerations or protection; and

(ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 4 of this Act [15 USCS § 1533], upon a determination by the Secretary that such areas are essential for the conservation of the species.

. . . .

(C) Except in those circumstances determined by the Secretary, critical habitat shall not include the entire geographical area which can be occupied by the threatened or endangered species.

16 U.S.C. § 1532(5)(A)-(C) (emphasis added).

7

24.

"The statute thus differentiates between "occupied" and "unoccupied" areas, imposing a more onerous procedure on the designation of unoccupied areas by requiring the Secretary to make a showing that unoccupied areas are essential for the conservation of the species." *Ariz. Cattle Grower's Ass'n v. Salazar*, 606 F.3d 1160, 1163 (9th Cir. 2010).

25.

The term "conservation" means the use of all methods and procedures necessary to bring a threatened or endangered species to "the point" at which the protections of the Act are no longer required. 16 U.S.C. § 1532(3).

26.

The Secretary must [d]esignate critical habitat . . . on the basis of the **best scientific data available** and after taking into consideration the economic impact . . . and any other relevant impact, of specifying any particular area as critical habitat. The Secretary may **exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat**, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat **will result in the extinction of the species concerned**.   16 U.S.C. § 1533(b)(2) (emphasis added).

**Consultation**

27.

Private property designated as critical habitat is subject to federal regulation.

28.

In consultation with the Secretary, federal agencies are required to ensure that any action they authorize, fund, or carry out "is not likely to jeopardize the continued existence of any

8

endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2).

29.

Section 7 of the Endangered Species Act also requires a federal agency to consult with the Secretary at the request of a permit applicant, if the applicant "has reason to believe that an endangered species or a threatened species may be present in the area affected by his project and that implementation of such action will likely affect such species." 16 U.S.C. § 1536(a)(3).

30.

Under Section 7, the Secretary must provide the consulting federal agency and applicant with a Biological Opinion summarizing the basis for the opinion and detailing how the project will impact a species or its critical habitat. *See* 16 U.S.C. § 1536(b)(3)(A).  If it is determined that the project is likely to jeopardize the species" "continued existence" or "result in the destruction or adverse modification of critical habitat" of such species, the opinion must suggest "reasonable and prudent alternatives" that may be taken by the consulting agency or applicant to avoid such impacts. *Id.*

31.

If it is determined that the "taking of an endangered species or a threatened species incidental to the agency action will not" jeopardize the species "continued existence or result in the destruction or adverse modification of critical habitat of such species, a written "incidental take statement" must be issued that (1) specifies the impact of such incidental taking on the species; (2) specifies those reasonable and prudent measures that are necessary or appropriate to minimize such impact; and (3), sets forth the terms and conditions with which the agency or

9

applicant must comply to implement the specified measures. 16 U.S.C. § 1536(b)(4)(B)(i), (ii) and (iv).

## National Environmental Policy Act

### 32.

The National Environmental Policy Act requires federal agencies to examine the environmental effects of proposed federal actions and to inform the public of the environmental concerns that went into the agency's decision making. Among other things, NEPA requires "to the fullest extent possible" all agencies of the federal government to prepare "environmental impact statements" for any "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

### 33.

An environmental impact statement must include:

(i) The environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

*Id.*

### 34.

The NEPA implementing regulations provide federal agencies with the opportunity to prepare an "environmental assessment" that either determines that an environmental impact statement is required or concludes with a "finding of no significant impact," which terminates the agency's NEPA obligations. 40 C.F.R. § 1508.9.

**Administrative Procedure Act**

35.

Pursuant to the Administrative Procedure Act, a court must set aside agency action that (a) fails to meet statutory, procedural, or constitutional requirements, or (b) is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A)-(D).

36.

Section 704 of the Administrative Procedure Act states that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."  5 U.S.C. § 704.

**United States Constitution**

37.

Commerce Clause enactments, like the Endangered Species Act, are subject to the limits of that power. "The Constitution grants Congress the power to '*regulate* commerce.'" Art. 1, § 8, cl. 3. (emphasis added).

38.

The designation of the Poitevent Lands as Critical Habitat for the Dusky Gopher Frog is contrary to Supreme Court precedent not only because the frog is not a regulable entity as it is not present on Poitevent Lands and will not be present in the future, but also because the Critical Habitat designation in this case **purports to create, rather than merely regulate**, the putative commerce connection.   The power to *regulate* commerce **presupposes the existence of commercial activity to be regulated**." *National Federation of Independent Business v. Sebelius*, 132 S.Ct. 2566, 2586 (2012) *see also id.* at  2573-74 ("This Court's precedent reflects this understanding: As expansive as this Court's cases construing the scope of the commerce power

11

have been, they uniformly describe the power as reaching "activity."  *E.g., United States v. Lopez*, 514 U.S. at 560, 115 S. Ct. 1624, 131 L. Ed. 2d 626. The [challenged provision], however, does not regulate existing commercial activity."); *See United States v. Lopez*, 514 U.S. 549 (1995); *United States v. Morrison*, 529 U.S. 598 (2000).

39.

In this case, with no frogs and no Primary Constituent Elements (PCEs) on the lands in Unit 1, there is no "activity" at all and therefore no need of regulation.  Instead of regulating commerce that exists, here the government has attempted to create a rule that reverse engineers or fabricates activity that does not exist.

40.

Because the required nexus to "commerce" (activity) is utterly lacking here, the Rule is fatally flawed and must be reversed for failing to comply with the Constitution.

## FACTUAL ALLEGATIONS

### Listing and Critical Habitat Designation

41.

On December 4, 2001, the U.S. Fish and Wildlife Service listed the **Mississippi Gopher Frog** as an endangered species. *See* 66 Fed. Reg. 62993, *et seq*.

42.

On June 12, 2012, the Service designated critical habitat for the **Dusky Gopher Frog**. *See* 77 Fed. Reg. 35118, *et seq.*

43.

Although critical habitat may only include those areas "**essential to the conservation of the species**," the Service made no finding as to the quantity or location of habitat necessary to

12

conserve the gopher frog or identify "the point" at which the protections of the ESA are no longer required.

44.

The critical habitat designation covers a total of 6,477 acres in two states, including 1,544 acres of forested land in St. Tammany Parish, Louisiana, known as Unit 1. *Id.* at 35118.

45.

The Poitevent Lands is private land in which the  Poitevent Landowners own an undivided interest. *Id.* at 35134-35135.

46.

The predecessor owners to the Poitevent Landowners of the land that makes up the Poitevent Lands leased the property to timber companies for timber farming operations since the 1950s.

47.

In 1953, the Poitevent Landowners entered into a long-term (90 year) timber lease on the Poitevent Lands with Gaylord Container Company.  The lease eventually was assigned to the present lessee, Weyerhaeuser Company, in the 1990s.  The lease gives the timber lessee the unfettered right to grow, cut and manage the timber on the leased premises in return for a flat rent paid to lessees.  The Poitevent Landowners have no right to review or advise on the timber planting or harvesting of the timber on their land under the timber lease, which is left solely to the commercial practices and techniques of their timber lessees.  As part of the pine tree crop planting and harvesting practices engaged in by the lessees, a loblolly pine crop plantation was planted on the leased premises beginning in the 1950s, when harvests of the mature timber crop began.  This then turned the leased premises (including the lands designated in the Rule) into an

13

active and intensely cultivated farm for a commercial crop, commonly known as a "tree farm," similar to any other agricultural area for any other crop.

48.

Loblolly pine is a tree species that grows to maturity in cycles of approximately 25 years, when it is then harvested for commercial use.  Young pine trees are planted in furrows similar to other crops such as sugar, wheat and corn, and then cut at maturity.  New pine trees are then planted once more, and the cycle of growth and harvesting of the pine crop is repeated. These pine tree planting and harvesting practices have thus converted the leased premises (including the Poitevent Lands designated in the Rule) into a tree farm.

49.

The Poitevent Landowners' 1953 timber lease expires on July 1, 2043, and therefore has about another 30 years to run, during which the noted pine tree planting and harvesting practices will be repeated.  Thereafter, if the Poitevent Landowners are prohibited from developing the Poitevent Lands under the Rule for commercial or residential purposes, they will continue the same pine tree planting and harvesting practices as are now employed by its timber lessee.

50.

Unit 1 is not currently occupied by the gopher frog nor was it occupied at the time of the listing in 2001. *Id.* at 35134-35135.

51.

The Service knew before it issued the Rule that the land was unoccupied by the gopher frog when the ESA became law in 1973, when the gopher frog was listed in 2001, and when notice of the proposed rulemaking was issued in 2011, and that it would never be occupied by the gopher frog and become usable habitat for the gopher frog in the future.

14

52.

The Poitevent Lands is not suitable for gopher frog habitat as it does not currently contain the physical or biological features essential to the conservation of the species.  *Id.* at 35135.

53.

The Poitevent Lands cannot be made suitable for gopher frog habitat without human intervention, including a change in land use, controlled burns to modify the vegetation, and the transplanting of species to the site.  *Id.* at 35129-35130.  These regular burns will cause air pollution, drive away other species, endanger the lives and property of surrounding landowners, destroy the value of the Poitevent Lands, as well as the value of the adjoining lands also owned by the Poitevent Landowners.  Moreover, given that Louisiana Highway 36 runs through the land, burning the land will create a life-threatening risk to drivers on Highway 36 and to inhabitants of the Pearl River community, only a few miles east of the Poitevent Lands.

54.

The designation creates a regulatory burden on the property such that it would require the Poitevent Landowners to break their lease with Weyerhaeuser, cease using the Poitevent Lands for its current commercial purpose as a tree farm, and begin burning the land in order to accommodate the non-existent Dusky Gopher Frog's critical habitat.  Then, if the Poitevent Landowners seek to do anything else on their property, they will have to seek and obtain costly federal approval, which would likely be denied as the Service has already indicated that it recommends no development on the property.  This will result in a drastic reduction in the value of the property, as well as that of the surrounding property, also owed by the Poitevent Landowners, and will do so for no legitimate government purpose, as the Dusky Gopher Frog is not currently present on the property and will never be.

15

55.

The Poitevent Landowners submitted comments to the Service opposing the designation and expressing their resolve not to manage the Poitevent Lands for gopher frog habitat.  *Id.* at 35123.

56.

The Service acknowledged that it cannot mandate that the Poitevent Lands be managed to make the area suitable for gopher frog habitat. *Id.* at 35126.

57.

The Service did not show how or why the Poitevent Lands – which is unoccupied and unsuitable as habitat for the gopher frog – is "essential" to the conservation of the species.

58.

Despite knowing that the land was unoccupied and unsuitable and that it would never be suitable or occupied by the gopher frog, the Service issued the rule anyway "hoping" that the Poitevent Landowners would be coerced into making the land suitable after they realized that there would be no realistic chance of ever developing any of their lands in Unit 1 given that the Service will then recommend a "**complete avoidance of development within Unit 1 in order to avoid adverse modification of the critical habitat**."  Exhibit "2," August 17, 2011 Economic Analysis for U.S. Fish and Wildlife Service, at p. 4-3 (emphasis added).

**The Dusky Gopher Frog vs. the Mississippi Gopher Frog**

59.

Before an animal species can receive the protection provided by the ESA, the animal must first be added to the Federal lists of threatened and endangered wildlife.

16

60.

In this case, in the Rule the Service announced that a species known as the "Dusky Gopher Frog" is endangered and then designated Unit 1 as its Critical Habitat.

61.

The species that was listed as endangered on December 4, 2001 was **not** the Dusky Gopher Frog but a "different species"-- the Mississippi Gopher Frog.  66 Fed. Reg. 62993.

62.

On November 27, 2007, as the Service had failed to find habitat for the Mississippi Gopher Frog, not the Dusky Gopher Frog, the Center for Biological Diversity and the Friends of Mississippi Public Lands sued the Service and the Secretary for its failure to timely designate Critical Habitat for the Mississippi Gopher Frog, **not** the Dusky Gopher Frog. See *Friends of Mississippi Public Lands and Center for Biological Diversity v. Kempthorne*, Case No.07-CV-02073, District Court, District of Columbia.

63.

In a court-approved settlement, the Service agreed to submit to the Federal Register a new prudency determination for the Mississippi Gopher Frog, **not** the Dusky Gopher Frog, and if the designation was found to be prudent, a proposed designation of Critical Habitat for the Mississippi Gopher Frog, **not** the Dusky Gopher Frog, by May 30, 2010, and a final designation for the Mississippi Gopher Frog, not the Dusky Gopher Frog, by May 30, 2011.

64.

Designation of Critical Habitat for the Mississippi Gopher Frog, **not** the Dusky Gopher Frog, was again found to be prudent, and a proposed rule to designate Critical Habitat for the

17

Mississippi Gopher Frog, **not** the Dusky Gopher Frog, was published on September 27, 2011. Fed. Reg., Vol. 76, No. 187, page 59774.

65.

In each of its notices and determinations prior to the issuance of the Rule, the Service considered and ruled upon the Mississippi Gopher Frog. The Mississippi Gopher Frog was the subject of the Center for Biological Diversity's lawsuit against the Service, as was the court-approved settlement between the Service and the Center for Biological Diversity, the EA, the proposed Rule and the Rule itself.  All comments received by the Service, including those made by the Poitevent Landowners and Markel, were directed to the Mississippi Gopher Frog, **not** the Dusky Gopher Frog.

66.

In the Rule, however, the Service--without notice and allowing the Poitevent Landowners an opportunity to comment as is required by law-- abruptly, arbitrarily and capriciously changed its mind and ruled that the endangered species was not the Mississippi Gopher Frog, but was instead a "different…species" -- the Dusky Gopher Frog.  It then found in the Rule that the Poitevent Lands are required, not for the Mississippi Gopher Frog's, but for the Dusky Gopher Frog's conservation and included the Poitevent Lands as part of the Dusky Gopher Frog's Critical Habitat, **not** for the Mississippi Gopher Frog.

67.

The Service further confirmed this by stating in the Rule as follows: "…the listed entity has now been accepted by the scientific community **as a unique species, Rana sevosa**." 77 Fed. Reg. 35118-01, 2012 WL 2090270 (F.R.), p. 4 (emphasis added).

18

68.

The Rule states:

> Subsequent to the listing of the dusky gopher frog (=Mississippi gopher frog), taxonomic research was completed that indicated that the entity (which we listed as a DPS of the Dusky Gopher Frog (Rana capito [sic] sevosa)) is different from other gopher frogs and warrants acceptance **as its own species** (Young and Crother 2001, pp. 382-388). The herpetological scientific community accepted this taxonomic change and the scientific name for the species was changed to Rana sevosa. In addition, all comments on taxonomy that we received during the comment periods for the revised Critical Habitat proposal were in agreement that the frog warrants acceptance as its own species.

Exhibit "3," Rule, p. 2 (emphasis added).

69.

The "species" under consideration until the Rule was issued in June, 2012 was always the "Mississippi Gopher Frog," **not** the "Dusky Gopher Frog." Yet now, the Poitevent Landowners' land has somehow become Critical Habitat for a "different species"-- the Dusky Gopher Frog-- all without advertisement, notice or an opportunity for the Poitevent Landowners to comment, and in violation of the ESA, the Service's rules and regulations thereunder and the requirements of the Administrative Procedure Act, along with basic constitutional principles of due process.

70.

The Dusky Gopher Frog is **not** an "endangered species" under the ESA, as it has never been listed by the Service as such.

71.

All of the rulemaking in this case covers exclusively the Mississippi Gopher Frog -- **not** the Dusky Gopher Frog -- and all comments and decision have been made in regard to the Mississippi Gopher Frog.

NO KGP1 462828 v5
0-0  02/25/2013

72.

As such, the Rule is invalid, arbitrary, capricious and illegal, and the Service acted improperly under the ESA and without notice to the Poitevent Landowners or a proper foundation for its conclusion in the Rule that the Dusky Gopher Frog is "endangered."

**Unit 1 Is Not a Significant Portion of The Dusky Gopher Frog's Range**

73.

The ESA protects species identified as either "endangered" or "threatened." A species is "endangered" if it "is in danger of extinction throughout all or a significant portion **of its range**." 16 U.S.C. § 1532(6) (emphasis added).

74.

On December 9, 2011 the Service and the National Marine Fisheries Service jointly published draft guidance defining the phrase "significant portion of its range" for purposes of listing a species under the Endangered Species Act (Act).  See, 76 Fed. Reg. 76987 (Dec. 9, 2011).

75.

The draft policy establishes that the Dusky Gopher Frog's  "range" was the general geographical area in which it was found at the time the listing decision for it was made in 2001.

76.

The draft policy also states that lost "historical range" will not be included in the definition of a "significant portion of its range":

> We conclude that while loss of historical range must be considered in evaluating the current status of the species, **lost historical range cannot be a significant portion of the range.** In other words, we cannot base a determination to list a species on the status of the species in lost historical range.

Federal Register, Vol. 76, No. 237, Friday, December 9, 2011, pages 76996 and 76997.

77.

The Service has acknowledged that "Unit 1 is not currently occupied nor was it occupied at the time the dusky gopher frog was listed." *See* 77 Fed. Reg. 35118-01, 2012 WL 2090270 (F.R.), page 10.

78.

The Service further recognizes that: "In Louisiana, the dusky gopher frog was last observed in 1965." *See* 77 Fed. Reg. 35118-01, 2012 WL 2090270 (F.R.), page 27.

79.

Thus, because the Dusky Gopher Frog was not present on the Poitevent Lands (or, indeed, anywhere else in Unit 1) when it was listed in 2001, and "lost historical range cannot be a significant portion of the range," neither the Poitevent Lands nor any other part of Unit 1 are a part of the Dusky Gopher Frog's range.

**Economic Impacts Analysis**

80.

In conjunction with the critical habitat designation, the Service completed an economic impacts analysis mandated by Section 4 of the Endangered Species Act. *See id.* at 35140-35141.

81.

That analysis showed that designating Unit 1 as critical habitat could have an adverse impact on the landowners as high as $33.9 million. *See id.* at 35141.

82.

On the record, the Service did not conduct a balancing analysis that weighed the economic impact on the landowners of Unit 1 against the benefit of including Unit 1 in the critical habitat designation.

21

83.

Notwithstanding the fact that Unit 1 is unsuitable for gopher frog habitat, the Service concluded that the "economic analysis did not identify any disproportionate costs that are likely to result from the designation." *Id.* at 35141.

84.

The Service relied on the "baseline approach" and did not consider the *quantitative* economic impacts of the critical habitat designation coextensively (or cumulatively) with the listing of the gopher frog as an endangered species. *Id.* at 35140-35142.

## NEPA Compliance

85.

The government admitted that it did not subject the critical habitat designation for the Dusky Gopher Frog to review under the National Environmental Policy Act. *See id.* at 35144.

## APA Compliance

86.

The rule designating critical habitat for the Dusky Gopher Frog, 77 Fed. Reg. 35118, *et seq.*, is the culmination of the Service's decision making and constitutes final agency action.

## Constitutional Compliance

87.

The Service made no finding that the designation of the Poitevent Lands or any other part of Unit 1 as critical habitat constitutes the regulation of existing commercial activity as the Constitution and Supreme Court precedent require. *See United States v. Lopez*, 514 U.S. 549 (1995).

NO KGP1 462828 v5
0-0  02/25/2013

## INJUNCTIVE RELIEF ALLEGATIONS

88.

The Poitevent Landowners re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 87 as though fully set forth herein.

89.

If an injunction does not issue enjoining Defendants from enforcing the critical habitat designation for the Dusky Gopher Frog, the Poitevent Landowners will be irreparably harmed.

90.

The Poitevent Landowners have no plain, speedy, and adequate remedy at law.

91.

If not enjoined by this Court, Defendants will continue to enforce or rely on the critical habitat designations in derogation of the Poitevent Landowners' rights.

92.

Accordingly, injunctive relief is appropriate.

## DECLARATORY RELIEF ALLEGATIONS

93.

The Poitevent Landowners re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 92 as though fully set forth herein.

94.

An actual and substantial controversy exists between the Poitevent Landowners and Defendants as to their legal rights and duties with respect to the ESA, NEPA, the APA, and the U.S. Constitution in the designation of critical habitat for the Dusky Gopher Frog.

NO KGP1 462828 v5
0-0  02/25/2013

95.

This case is presently justiciable because Defendants' failure to comply with these laws is the direct result of final agency action that has caused and will continue to cause immediate and concrete injury to the Poitevent Landowners.  The Poitevent Landowners have a vital interest in knowing whether the critical habitat designation, to which the Poitevent Landowners are subject, is statutorily and constitutionally valid.

96.

Declaratory relief is therefore appropriate to resolve this controversy.

## CLAIMS FOR RELIEF

### First Claim for Relief

**Designation of Critical Habitat for a Species Not Listed on the Endangered Species List**
**(Violation of ESA, 16 U.S.C. § 1533(b)(2);**
**Alternatively, APA, 5 U.S.C. § 706)**

97.

The Poitevent Landowners re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 96 as though fully set forth herein.

98.

The Endangered Species Act allows for the designation of critical habitat only for species that are listed on the Endangered Species List.

99.

On December 4, 2001, the U.S. Fish and Wildlife Service listed the Mississippi Gopher Frog as an endangered species. *See* 66 Fed. Reg. 62993, *et seq.*

100.

In all notices and determinations prior to the issuance of the Rule, the Service considered, received comment on, and made a proposed ruling on the Mississippi Gopher Frog.

24

101.

Unit 1 was thereafter designated as critical habitat for the Dusky Gopher Frog, not the Mississippi Gopher Frog, a difference species.

102.

The designation of critical habitat for the Dusky Gopher Frog violates the ESA because the Dusky Gopher Frog is not an endangered species, according to the Endangered Species List.

103.

Moreover, the designation for critical habitat for the Dusky Gopher Frog without advertisement, notice or an opportunity for the Poitevent Landowners to comment, violates the ESA, the Service's rules and regulations and the requirements of the Administrative Procedure Act.

104.

By all these acts or omissions, Defendants violated the ESA, 16 U.S.C. § 1533(b)(2) and, alternatively, the APA, 5 U.S.C. § 706. The final rule designating critical habitat for the Dusky Gopher Frog is, therefore, invalid.

**Second Claim for Relief**
**Failure to Make Threshold Determination for Designating Critical Habitat**
**(Violation of ESA, 16 U.S.C. § 1533(b)(2); 50 C.F.R. § 424.12(e);**
**Alternatively, APA, 5 U.S.C. § 706)**

105.

The Poitevent Landowners re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 104 as though fully set forth herein.

106.

The Endangered Species Act defines critical habitat as those areas "**essential to the conservation of the species**." 16 U.S.C. § 1532(5) (emphasis added). In turn, the Act defines

25

"conservation" to mean the use of all methods and procedures necessary to bring a "threatened" or "endangered" species to "the point" at which the protections of the Act are no longer required. 16 U.S.C. § 1532(3). The Act does not define "essential" but it is axiomatic that to determine what is "essential to the conservation of the species," the Service must first identify "the point" when the species will no longer be "threatened" or "endangered." That point can be identified only if the Service has determined a viable population size and the minimum habitat necessary to sustain that population. However, those threshold determinations are entirely missing from the final rule.

107.

The effect of the Service's failure to determine a viable population and minimum habitat size is that the Service is logically incapable of ascertaining which areas are "essential to the conservation of the species" and whether the designation of any particular unoccupied area is required. *See* 50 C.F.R. § 424.12(e) ("The Secretary shall designate as critical habitat areas outside the geographical area presently occupied by a species only when a designation limited to its present range would be inadequate to ensure the conservation of the species."). In this case, there are no facts found in the rule from which to draw a rational connection as to the size of the critical habitat area. Without the foundational underpinning of a viable population, no one, including the Service, can determine whether the areas designated as critical habitat are too much or too little.

108.

By all these acts or omissions, Defendants violated the ESA, 16 U.S.C. § 1533(b)(2); federal regulation, 50 C.F.R. § 424.12(e); and, alternatively, the APA, 5 U.S.C. § 706. The final rule designating critical habitat for the Dusky Gopher Frog is, therefore, invalid.

**Third Claim for Relief**
**Failure to Apply Correct Standard to Determine Critical Habitat**
**(Violation of ESA, 16 U.S.C. § 1533(b)(2); Alternatively, APA, 5 U.S.C. § 706)**

109.

The Poitevent Landowners re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 108 as though fully set forth herein.

110.

The Secretary does not have unfettered discretion to designate any or all unoccupied areas as Critical Habitat.  Rather, in order to be properly designated, unoccupied areas must be "essential for the conservation of the species."  16 U.S.C. § 1532(5)(ii); *see Cape Hatteras Access Preservation Alliance v. U.S. Dept. of Interior*, 344 F. Supp.2d 108, 122 (D.C.C. 2004) (noting that "The Service may not statutorily cast a net over tracts of land with the mere hope that they will develop PCEs and be subject to designation").

111.

In making a Critical Habitat designation, the Service "shall consider those physical and biological features that are essential to the conservation of a given species and that may require special management considerations." 50 CFR §424.12(b); 16 U.S.C. §1532(5)(a).   Those features include (1) space; (2) food, water, air, light, minerals, or other nutritional or physiological requirements; (3) cover or shelter; (4) breeding and nesting sites; and (5) habitats protected due to their historic geographic or ecological distribution of the species. 50 C.F.R. §424.12(b)(1)-(5).

112.

Based on the administrative record for  the Rule and related materials made available by the Service, Unit 1 does not meet the minimum mandatory statutory criteria for Critical Habitat

designation. Unit 1 contains none of the PCEs of the Dusky Gopher Frog's habitat, and is and will remain subject to adverse impacts identified by the Service as significant threats to habitat, with the result that Unit 1 will continue to remain a very unfavorable habitat for the frog in the future.

113.

The Service requires that land have the three following PCEs for the Dusky Gopher Frog:

        1)      ephemeral wetland habitat;

        2)      upland forest non-breeding habitat; and

        3)      upland connectivity habitat.

77 Fed. Reg. 35131.   The Service maintains that these three PCEs are "essential to the conservation of the species."  By definition, therefore, all three PCEs must be present for an area to qualify as "essential."

114.

The presence of the requisite PCEs is a **predicate to designation of critical habitat**, thus all three PCEs must be present on the land at the time of the rulemaking, not at some potential time in the future. *See Cape Hatteras Access Preservation Alliance v. Department of Interior*, 344 F. Supp. 2d. 108, 123 (2004) ("PCEs must be 'found' on an area is a prerequisite to designation of that area as critical habitat.  The Service's argued-for interpretation, essentially that designation is proper merely if PCEs will likely be found in the future, is simply beyond the pale of the statute.") (emphasis added).

115.

The Service acknowledges, that Unit 1 does not "contain sufficient PCEs to support all of the life-history functions essential for the conservation of the species." 76 Fed. Reg. 59780.

28

116.

With respect to PCE No. 1 (ephemeral wetland habitat), Dusky Gopher Frogs need geographically isolated breeding ponds that are small, "ephemeral' and acidic. 76 Fed. Reg. 59779. The following physical characteristics are also necessary: (a) an open canopy with emergent herbaceous vegetation for egg attachment; (b) absence of large predatory fish; (c) high water quality; and (d) surface water that lasts for a minimum of 195 days during the breeding season. *Id*.

117.

None of the five ponds within Unit 1 suggested as posing potential for rehabilitation - Hyla Pond, Amy's Pond, Sevosa Pond, Small Pond and Dry Pond  - constitute suitable habitat for the Dusky Gopher Frog at this time.

118.

In addition, the Service has not proven that the ponds are "ephemeral," in that they currently do not have a hydro-period suitable for Dusky Gopher Frog reproduction.  The Rule notes the following on the critical nature of pond ephemerality in order to support frog life: "[P]onds have to hold water long enough to allow for tadpole development and metamorphosis, but if they hold water too long they become permanent ponds and no longer have value for ephemeral pond-breeding amphibians." 77 Fed. Reg. 35118-01, 2012 WL 2090270 (F.R.), page 11.

119.

Other than its conclusory statements that the ponds are "ephemeral," the Service has failed to show by any evidence in the record in the Rule that any of the noted ponds is truly

NO KGP1 462828 v5
0-0  02/25/2013

"ephemeral" so that it will support the frog.  In fact, the record contains no evidence that the ponds are ephemeral, and the Service could not possibly have proven this to any degree of scientific or legal certainty on its **one-day site visit to Unit 1 in March 2011**.

120.

As the ponds on Unit 1 have not been shown to be "ephemeral," and the "ephemeral" nature of the ponds is a necessary element of the frog's habitat, PCE No. 1 is not present on the land, and the Rule was improperly issued under the Act and is also arbitrary and capricious under the Administrative Procedure Act, as far as it concerns Unit 1.

121.

With respect to PCE No. 2 (upland forest non-breeding habitat), this element requires forests surrounding the open-canopied breeding ponds that were historically dominated by longleaf pine that are "maintained by fires frequent enough to support an open canopy and abundant herbaceous ground cover and gopher tortoise burrows, small mammal burrows, stump holes, or other underground habitat." 76 Fed. Reg. 59779.

122.

Weyerhaeuser, the timber lessee on the land, does not burn the land as part of its operations.  The absence of necessary burning of the land will permit continued encroachment by hardwood species.  Encroachment will then accelerate as the hardwoods further dominate the pond sites. See 76 Fed. Reg. 59780.

123.

In its listing decision for the Dusky Gopher Frog, the Service identified clear-cut timber harvesting and bedding as two practices likely to disturb or destroy burrows and underground habitat. 66 Fed. Reg. 62997-98.  Unit 1 (of which the Poitevent Landowners own approximately

30

95%) is currently used as a timber farm, and the areas surrounding the five ponds are bedded pine plantations specifically planted for clear-cut timber harvesting at maturity.  Because clear-cut timber harvesting and bedding are an essential part of the timber farming operations undertaken by Weyerhaeuser on the land, these activities will disturb or destroy the burrows and underground habitat, making the property unsuitable.  Thus, in the areas surrounding the five ponds, the pine forests do not qualify as constituting PCE Element 2.

124.

Because PCE Element No. 2 is not present on the land, the Rule was improperly issued under the Act and is also arbitrary and capricious under the Administrative Procedure Act, as far as it concerns Unit 1.

125.

PCE Element 3 involves the suitability of the habitat between the ponds and underground burrows to facilitate movement between breeding habitat and non-breeding habitat.  That habitat, too, must have an open canopy with "abundant herbaceous species and subsurface structure which provides shelter for Mississippi gopher frogs during seasonal movements, such as that created by deep litter cover, clumps of grass, or burrows. 76 Fed. Reg. 59780.

126.

The pine stands within Unit 1 — particularly those around the five ponds -- have high "tree per acre" counts, and will quickly form closed canopies. Closed canopies will then limit development of significant herbaceous ground cover.

31

127.

Because PCE Element No. 3 is not present on the land, the Rule was improperly issued under the Act and is also arbitrary and capricious under the Administrative Procedure Act, as far as it concerns Unit 1.

128.

Accordingly, as all three required PCEs for the Dusky Gopher Frog are not present in Unit 1, the Rule violates the requirements of the ESA and is also arbitrary and capricious and in violation of the Administrative Procedure Act.

129.

Moreover, "[f]requent fires are necessary to maintain the open canopy and ground cover vegetation of [the gopher frog's] aquatic and terrestrial habitat." 76 Fed. Reg. 59775, and ". . . fire is the only known management tool that will maintain the existing breeding pond as suitable habitat."  The Poitevent Landowners have no intention of burning their property to make it a suitable habitat, nor can they be required to by law; thus Unit 1 will never be a suitable habitat for the gopher frog.

130.

About the most that can be said about Unit 1 is that it has the "potential" for rehabilitation back into Dusky Gopher Frog habitat (as is also true for countless other acres across the United States). The presence of three merely "potential" PCEs does not rise to the level of three actual PCEs necessary to make the Rule valid and proper. *Cape Hatteras Access Preservation Alliance v. U.S. Dept. of Interior*, 344 F. Supp.2d 108, 122 (D.C.C. 2004) (emphasis added) ("The Service may not statutorily cast a net over tracts of land with the mere hope that they will develop PCEs and be subject to designation.").

131.

By these acts or omissions, Defendants violated the ESA, 16 U.S.C. § 1533(b)(2); and, alternatively, the APA, 5 U.S.C. § 706.  The final rule designating critical habitat for the Dusky Gopher Frog is, therefore, invalid.

**Fourth Claim for Relief**
**Inadequate Economic Analysis**
**(Violation of ESA, 16 U.S.C. § 1533(b)(2);**
**Alternatively, APA, 5 U.S.C. § 706)**

132.

The Poitevent Landowners re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 131 as though fully set forth herein.

133.

The Economic Analysis (EA) adopts the "baseline" approach whereby the Service only considers the *qualitative* impacts that occur "without critical habitat," such as those impacts caused by listing of the species, whereas the incremental impacts occurring "with critical habitat" are given a *quantitative* analysis. *See* 77 Fed. Reg. at 35140-35141. The result of this approach is that neither the Service nor the public are ever provided a meaningful cumulative economic impacts analysis.  This "baseline" approach was rejected by the Tenth Circuit in *New Mexico Cattle Growers Association v. U.S. Fish and Wildlife Service*, 248 F.3d 1277 (10th Cir. 2001). According to the Tenth Circuit, the "baseline" approach is meaningless and inconsistent with the language of the Act and the intent of Congress. Therefore, that Circuit held the Economic Analysis must consider all of the impacts of critical habitat designation, including those impacts co-extensive with the listing. In other words, the EA must consider the cumulative impacts of the listing and the critical habitat designation together, not just the incremental impacts of the designation. (For a contrary view see *Arizona Cattle Growers' Association v. Salazar*, 606 F.3d

33

1160 (9th Cir 2010).) In *Home Builders Association of Northern California v. Norton*, 293 F. Supp. 2d 1 (D.D.C. 2002), the Service appears to have represented to the court that it would follow the *New Mexico Cattle Growers'* co-extensive approach in all future critical habitat designations.  But it has not done so here.

134.

Moreover, the EA failed to quantify economic and other impacts of the designation on oil and gas exploration, forestry, and those impacts resulting from conservation activities such as controlled burns.

135.

In addition, the EA did not quantify the clear economic devaluation of the Poitevent Landowners' adjacent lands due to the requirement that the Critical Habitat lands be burned (which is not currently done by Weyerhaeuser in connection with the timber operations) or take into account the danger to life and property in Pearl River, Louisiana or the danger to drivers on LA Highway 36, or to damages resulting from the Poitevent Landowners' breach of their existing timber lease with Weyerhaeuser.

136.

In failing to consider this additional economic impact, the Service violated its stated goal of quantifying all economic impacts of the Rule. ("The intent of the [EA] is to quantify the economic impacts of all potential conservation efforts for the dusky gopher frog.") See, 77 Fed. Reg. 35118-01, 2012 WL 2090270 (F.R.), page 40. (emphasis added.)

34

137.

By these acts or omissions Defendants violated the ESA, 16 U.S.C. § 1533(b)(2); and, alternatively, the APA, 5 U.S.C. § 706. The final rule designating critical habitat for the Dusky Gopher Frog is, therefore, invalid.

**Fifth Claim for Relief**
**Failure to Exclude**
**(Violation of ESA, 16 U.S.C. § 1533(b)(2);**
**Alternatively, APA, 5 U.S.C. § 706)**

138.

The Poitevent Landowners re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 137 as though fully set forth herein.

139.

The Service acknowledged, as it must, that Unit 1 will only become suitable habitat if the land is managed to develop the requisite PCEs. *See* 77 Fed. Reg. 35135. The Service also acknowledged that Unit 1 is comprised entirely of private land, *Id.* at 35134-35135, and that private landowners cannot be compelled to manage the land for recovery purposes, *Id.* at 35126. In fact, because Unit 1 is unoccupied and used for timber harvesting and has the potential for development of oil and gas exploration, that the Service valued at approximately $34 million, the private owners have no intent to convert their property to conservation purposes. Not only do these facts compel a finding that Unit 1 is not "essential for the conservation of the species," but they also compel a finding that the benefits of exclusion outweigh the benefits of inclusion under Section 4(b)(2) of the Act. The Service's unsupported conclusion that the "economic analysis did not identify any disproportionate costs that are likely to result from the designation," 77 Fed. Reg. 35141, is arbitrary and irrational. *See Natural Resources Defense Council v. U.S. Department of Interior*, 113 F.3d 1121, 1124 (9th Cir. 1997) ("Essentially, we must ask 'whether

35

the agency considered the relevant factors and articulated a rational connection between the facts found and the choice made.'" (citation omitted)).

140.

By these acts or omissions, Defendants violated the ESA, 16 U.S.C. § 1533(b)(2); and, alternatively, the APA, 5 U.S.C. § 706. The final rule designating critical habitat for the Dusky Gopher Frog is, therefore, invalid.

**Sixth Claim for Relief**
**Failure to Conduct NEPA Review**
**(Violation of NEPA, 42 U.S.C. § 4321, *et seq.*;**
**Alternatively, APA, 5 U.S.C. § 706)**

141.

The Poitevent Landowners re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 140 as though fully set forth herein.

142.

In its final rule designating critical habitat for the Dusky Gopher Frog, the Service stated categorically that the National Environmental Policy Act does not apply to critical habitat designations outside the Tenth Circuit Court of Appeals. *See* 77 Fed. Reg. at 35121.  But the better argument is to the contrary.

143.

Neither the Endangered Species Act nor any other statute exempts critical habitat designations from NEPA compliance. Both the Tenth Circuit in *Catron County Board of Commissioners v. U.S. Fish and Wildlife Service*, 75 F.3d 1429 (10th Cir. 1996), and the D.C. District Court, in *Cape Hatteras Access Preservation Alliance v. U. S. Department of Interior*, 344 F. Supp. 2d 108 (D.D.C. 2004), have held that critical habitat designations are subject to review under NEPA. In *Douglas County v. Babbitt*, 48 F.3d 1495 (9th Cir. 1995), the Ninth

36

Circuit parted ways with the Tenth Circuit and held that NEPA review was not required for critical habitat designations where there is no physical change to the environment.  However, this case is different.

144.

Contrary to *Douglas County*, the critical habitat designation for the Dusky Gopher Frog literally calls for human interference with the environment through management of the habitat by, among other things, regular controlled burns.  Frequent fires are necessary to maintain the open canopy and ground cover vegetation of the gopher frog's aquatic and terrestrial habitat. *See* 77 Fed. Reg. 35129-35130.  These burns can have significant adverse effects on the physical environment, including air pollution, water pollution, loss of forest resources, and habitat for other species.  But the critical habitat designation does not discuss these effects.  That can only be done through the NEPA review process.  Therefore, notwithstanding the Ninth Circuit decision, and in accordance with the Tenth Circuit decision, NEPA review should have been undertaken here.

145.

By these acts or omissions Defendants violated NEPA, 42 U.S.C. § 4321, *et seq.*; and the APA, 5 U.S.C. § 706.  The final rule designating critical habitat for the Dusky Gopher Frog is, therefore, invalid.

**Seventh Claim for Relief**
**U.S. Constitutional Violation**
**(Commerce Clause, Article 1, Section 8,**
**Clause 3, and APA, 5 U.S.C. § 706)**

146.

The Poitevent Landowners re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 145 as though fully set forth herein.

37

147.

The Service cites a long list of cases that have upheld the agency's authority to regulate intrastate, noncommercial species under the commerce power. *See* 77 Fed. Reg. at 35120. However, those cases do not address whether the agency has authority under the Commerce Clause to regulate private land that has no connection to the protected species other than through the critical habitat designation itself. The designation of Unit 1 as critical habitat for the Dusky Gopher Frog is contrary to Supreme Court precedent not only because the frog is not a regulable entity but also because the critical habitat designation creates, rather than regulates, the putative economic activity. *See United States v. Lopez*, 514 U.S. 549; *United States v. Morrison*, 529 U.S. 598 (2000); and, more recently, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2573-74 (2012) ("This Court's precedent reflects this understanding: As expansive as this Court's cases construing the scope of the commerce power have been, they uniformly describe the power as reaching, activity." *E.g.*, *United States v. Lopez*, 514 U.S. at 560, 115 S. Ct. 1624, 131 L. Ed. 2d 626. The [challenged provision], however, does not regulate existing commercial activity."). Simply put, the uncontested facts show that the Service is not regulating existing commercial activity. The regulation of Unit 1 as critical habitat is unconstitutional because the land does not contain the listed species or any usable habitat and any activity on the land cannot affect the species or its habitat.

148.

By these acts or omissions Defendants violated art. 1, § 8, cl. 3, of the U.S. Constitution and the APA, 5 U.S.C. § 706. The final rule designating critical habitat for the Dusky Gopher Frog is, therefore, invalid.

38

## PRAYER FOR RELIEF

Wherefore, The Poitevent Landowners pray:

**As to the First Claim for Relief:**

That this Court declare the Rule designating critical habitat for the Dusky Gopher Frog invalid because the ESA requires that critical habitats only be designated for listed species, and Defendants designated a critical habitat for a species not listed on the Endangered Species List, and without notice or opportunity for the Poitevent Landowners to be heard, in violation of Section 4(b)(2) of the ESA, 16 U.S.C. § 1533(b)(2), or alternatively, that the Rule is void under the APA, U.S.C. § 706.

**As to the Second Claim for Relief:**

That this Court declare the Rule designating critical habitat for the Dusky Gopher Frog invalid because Defendants failed to make the threshold determination as to the quality and location of habitat essential to the conservation of the species in violation of Section 4(b)(2) of the ESA, 16 U.S.C. § 1533(b)(2), or alternatively, that the Rule is void under the APA, U.S.C. § 706.

**As to the Third Claim for Relief:**

That this Court declare the Rule designating critical habitat for the Dusky Gopher Frog invalid because Defendants failed to apply the proper standard for designating critical habitat in violation of Section 4(b)(2) of the ESA, 16 U.S.C. § 1533(b)(2), or, alternatively, that the Rule is void under the APA, 5 U.S.C. § 706.

NO KGP1 462828 v5
0-0  02/25/2013

**As to the Fourth Claim for Relief:**

That this Court declare the Rule designating critical habitat for the Dusky Gopher Frog invalid because the economic analysis was inadequate in violation of Section 4(b)(2) of the ESA, 16 U.S.C. § 1533(b)(2), or, alternatively, that the Rule is void under the APA, 5 U.S.C. § 706.

**As to the Fifth Claim for Relief:**

That this Court declare the Rule designating critical habitat for the Dusky Gopher Frog invalid because Defendants' failure to exclude Unit 1 was arbitrary and irrational in violation of Section 4(b)(2) of the ESA, 16 U.S.C. § 1533(b)(2), or, alternatively, that the Rule is void under the APA, 5 U.S.C. § 706. 22

**As to the Sixth Claim for Relief:**

That this Court declare the Rule designating critical habitat for the Dusky Gopher Frog invalid because Defendants failed to comply with NEPA, 42 U.S.C. § 4321, *et seq.*, and the Rule is void under the APA, 5 U.S.C. § 706.

**As to the Seventh Claim for Relief:**

That this Court declare the Rule designating critical habitat for the Dusky Gopher Frog invalid under the Commerce Clause, U.S. Constitution, art. 1, § 8, cl. 3, and the Rule is void under the APA, 5 U.S.C. § 706.

**As to all Claims for Relief:**

That this Court:

(a) issue a judgment and order enjoining Defendants from enforcing or otherwise acting pursuant to the final rule, vacating the Rule, and remanding the rule for redesignation of critical habitat in accordance with ESA, NEPA, the APA, and the U.S. Constitution; (b) award Plaintiffs

40

attorneys' fees and costs to the extent permitted by law; and (c) grant such other relief as the Court shall deem just and proper.

(b) award Plaintiffs attorneys' fees and costs to the extent permitted by law; and

(c) grant such other relief as the Court shall deem just and proper.

Respectfully submitted,

**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC**

By: _____s/ Edward B. Poitevent, II_____
EDWARD B. POITEVENT, II (#10564)
BRIAN M. BALLAY  (#29077)
KATHLYN G. PEREZ (#30668)
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana   70170
Telephone:  (504) 566-5200
Facsimile:  (504) 636-4000

**ATTORNEYS FOR P&F LUMBER COMPANY
(2000), L.L.C., ST. TAMMANY LAND CO,
L.L.C. AND PF MONROE PROPERTIES,
L.L.C**.

NO KGP1 462828 v5
0-0  02/25/2013